**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 12-cv-01075-CMA

JULIO ONTIVEROS-PEREZ,

      Applicant,

v.

ANGEL MEDINA, Warden, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

      Respondents.

---

## ORDER DISMISSING APPLICATION FOR WRIT OF HABEAS CORPUS

---

The matter before the Court is an Application For A Writ Of Habeas Corpus

Pursuant to 28 U.S.C. § 2254.[1]  Applicant, Julio Ontiveros-Perez, challenges the validity

of his convictions in Case Nos. 06CR656 and 06CR1122 in the Jefferson County,

Colorado, District Court.  The Court has determined that the Application can be resolved

on the parties' briefing and that no oral argument or evidentiary hearing is necessary.

*See* 28 U.S.C. § 2254(e); Fed. R. Governing Section 2254 Cases 8(a).

## I. BACKGROUND

In 2005 and 2006, several pay-day loan centers, check-cashing businesses, and

insurance companies were robbed in the Denver metropolitan area.[2]  In December

2006, a jury in the Jefferson County, Colorado District Court found Applicant guilty

of four counts of kidnapping involving robbery; five counts of robbery with a deadly

---

[1]  Doc. # 1.

[2]  Doc. # 11-1 at 2.

weapon, three counts of robbery with a simulated weapon; one count of attempted

aggravated robbery with a deadly weapon; and, seven crime-of-violence sentence

enhancers.[3]  The state trial court imposed an aggregate sentence of 56 years in the

Colorado Department of Corrections.[4]

The Colorado Court of Appeals affirmed Applicant's convictions on direct appeal.

*See People v. Ontiveros-Perez*, 07CA0716 (Colo. App. March 17, 2011) (unpublished).[5]

The Colorado Supreme Court denied Applicant's petition for certiorari review on

September 12, 2011.[6]  The United States Supreme Court denied certiorari review on

June 26, 2012.[7]

Applicant filed *pro se* his Application for a Writ of Habeas Corpus on April 23,

2012.   He asserts three claims in the Application:

(1)  Applicant's rights under the Fifth Amendment and *Miranda*[8] were
violated by the trial court's failure to suppress incriminating statements
Applicant made following a *Miranda* advisement in English. Applicant
states that he did not understand the advisement, as English is his
second language.

(2)  Applicant's rights under the Fourteenth Amendment were violated by
prosecutorial misconduct in closing argument.

---

[3]  Doc. # 11-2 at 13.

[4]  State Court R., Court File at 352-3.

[5]  Doc. # 11-1.

[6]  Doc. # 11-3.

[7]  Doc. # 11-4.

[8]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

(3) Applicant's right not to be twice put in jeopardy for the same offense was violated because he was convicted of robbery, and his kidnapping convictions were enhanced based on the fact that the victims were robbed.[9]

On May 11, 2012, Magistrate Judge Boland ordered the Respondents to file a pre-answer response addressing the issues of timeliness and exhaustion of state court remedies. Respondents filed their Pre-Answer Response on June 26, 2012. Respondents concede that the Application is timely and that Applicant has exhausted state remedies for the claims raised in the Application.[10] Accordingly, the Court addresses the merits of those claims below.

## II. LEGAL STANDARDS

**A.    28 U.S.C. § 2254**

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court unless the state court adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The applicant bears the burden of proof under § 2254(d). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

---

[9]   Doc # 1 at 5-7.

[10]   Doc. # 11.

The court reviews claims of legal error and mixed questions of law and fact pursuant to 28 U.S.C. § 2254(d)(1).  *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003).  The threshold question the court must answer under § 2254(d)(1) is whether the Applicant seeks to apply a rule of law that was clearly established by the Supreme Court at the time his conviction became final.  *See Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412.  Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).  If there is no clearly established federal law, that is the end of the court's inquiry pursuant to § 2254(d)(1).  *See id.* at 1018.

If a clearly established rule of federal law is implicated, the court must determine whether the state court's decision was contrary to or an unreasonable application of that clearly established rule of federal law.  *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405).  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Williams*, 529 U.S. at 405 (citation omitted).

4

> A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts. *Id.* at 407-08. Additionally, we have recognized that an unreasonable application may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply.

*House*, 527 F.3d at 1018.

The court's inquiry pursuant to the "unreasonable application" clause is an objective inquiry. *See Williams*, 529 U.S. at 409–10. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." *Id.* at 411. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671. In addition,

> evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. [I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (internal quotation marks omitted). In conducting this analysis, the court "must determine what arguments or theories supported or . . . could have supported[ ] the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* Moreover, "review under  § 2254(d)(1) is limited to the record that was before the state

court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671; *see also Richter*, 131 S. Ct. at 786 (stating that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable").

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 131 S. Ct. 786–87.

The court reviews claims asserting factual errors pursuant to 28 U.S.C. § 2254(d)(2). *See Romano v. Gibson*, 278 F.3d 1145, 1154 n. 4 (10th Cir. 2002). Section 2254(d)(2) allows the federal court to grant a writ of habeas corpus only if the relevant state court decision was based on an unreasonable determination of the facts in light of the evidence presented to the state court. Pursuant to § 2254(e)(1), the court must presume that the state court's factual determinations are correct and the petitioner bears the burden of rebutting the presumption by clear and convincing evidence. "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.'" *Miller–El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003)).

**B.    PRO SE LITIGANT**

6

Applicant is proceeding *pro se*. The court, therefore, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). However, a pro se litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not assume that an applicant can prove facts that have not been alleged, or that a respondent has violated laws in ways that an applicant has not alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).  The Applicant's pro se status does not entitle him to an application of different rules. *See Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002).

### III. <u>ANALYSIS</u>

### A.    ADMISSION OF APPLICANT'S STATEMENT TO THE POLICE

For his first claim, Applicant assert that his Fifth Amendment right to remain silent was violated by the trial court's failure to suppress incriminating statements he  made to the police following a *Miranda* advisement in English.  Applicant states that he did not understand the advisement, as English is his second language.[11] He further maintains that promises of leniency by the police "basically coerced" him into incriminating himself.[12]

---

[11]   Doc # 1 at 5-6.

[12]   *Id.*

7

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.  Further, due process prohibits conviction of a defendant based, "in whole or in part, upon an involuntary confession." *Jackson v. Denno*, 378 U.S. 368, 376 (1964).  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that law enforcement officers must employ certain procedural safeguards to ensure that a criminal suspect's right against compulsory self-incrimination is protected during an interrogation.  *Id.* at 478-79.  The suspect must be advised of the possible use of his statements against him and his right to have counsel present during the interrogation. *Id.* at 468-71.

*Miranda* rights may be waived.  "To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary . . . ."  *Maryland v. Shatzer*, 130 S.Ct. 1213, 1219 (2010).  A waiver of a constitutional right is knowing and intelligent if it is made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  *See Moran v. Burbine*, 475 U.S. 412, 421 (1986).  A waiver is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception."  *Id.*; *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (the test is "whether a [suspect's] will was overborne by the circumstances surrounding the giving of a confession.") (internal quotation marks omitted); *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'").  *See also Brady v. United States*, 397 U.S. 742, 753 (1970) (to be voluntary, a statement "must not be extracted by any sort of

threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence."). In making the voluntariness determination, the trial court must consider the totality of the circumstances surrounding the defendant's statement. *Clewis v. Texas*, 386 U.S. 707, 708 (1967).

Waiver may be implied from the circumstances, in the absence of an express oral or written waiver. "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2262 (2010).

1. **Relevant Facts**

The following summary of relevant facts is taken from the Colorado Court of Appeals' decision on direct appeal of Applicant's conviction and is supported by the evidence presented at the state court suppression hearing, including a videotaped recording of Applicant's interview with the police detective.

During 2005 and early 2006, a series of similar robberies was committed in the Denver metropolitan area. The suspect targeted pay-day loan and check-cashing businesses and insurance companies. Police nicknamed the perpetrator the "I'll-Be-Back Bandit," because in each robbery, he would enter the institution, spend an unusually long time there, and leave, only to return some time later and commit the robbery.

On February 16, 2006, police officers responded to a panic alarm from a State Farm insurance office. Upon arriving at the office, the officers found Ontiveros-Perez standing next to an employee of the company, who was seated at a desk. They arrested and handcuffed him and retrieved a black pellet gun from his pants and a folding, two-bladed knife that he was carrying.

Ontiveros-Perez was then placed in the back of a police car. The arresting officer, having observed that Ontiveros-Perez spoke with a Spanish accent, asked him about his understanding of English.

Ontiveros-Perez responded that he understood English, and the officer advised him of his *Miranda* rights. When asked whether he understood those rights, Ontiveros-Perez responded that he did, and he agreed to speak with the officer.

The officer then asked Ontiveros-Perez what he had been doing at the State Farm office and why he had the gun with him.  He responded that he was sorry and that he was having money problems.  He told the officer that he had intended to lift up his shirt, show his gun to the employee, and demand money.  The officer then drove Ontiveros-Perez to the Arvada Police Department, where he was booked for possible attempted robbery.

At the police station, Arvada's lead robbery detective was informed that a robbery arrest had been made at an insurance agency. The detective observed Ontiveros-Perez in the holding cell and determined that he matched the physical description of the I'll-Be-Back Bandit. The detective then interviewed Ontiveros-Perez for approximately one hour.

At the beginning of the interview, the detective informed Ontiveros-Perez that he was a robbery investigator. He then obtained some preliminary information and stated that Ontiveros-Perez appeared to understand him well. Ontiveros-Perez confirmed that he understood the detective and said, "If I get in trouble, I just let you know I don't understand and I try. I do my best."

The detective and Ontiveros-Perez then together read a form containing the *Miranda* warnings in both English and Spanish. Ontiveros-Perez confirmed that he understood his rights, indicated his willingness to speak with the detective, and signed the form, affirming his understanding of his rights and his willingness to waive them. Ontiveros-Perez did not request an interpreter at any point during the interview. Moreover, as the trial court observed, the video recording of the interview shows that Ontiveros-Perez spoke and understood English well and that he and the detective had no difficulty communicating with one another, even though Ontiveros-Perez was unclear and needed assistance understanding the word "mattress" and the phrase "stun gun."

In the course of this interview, Ontiveros-Perez again acknowledged that he had planned to rob the State Farm office and apologized for his conduct. He stated, however, that he had not intended to hurt anyone.

The detective then questioned him about other robberies. Ontiveros-Perez admitted that he committed several of these and gave

specific information about them, including, for example, what the clerks looked like, the amounts of money he stole, and, in some cases, where he parked. In addition, Ontiveros-Perez denied committing one of the robberies about which the detective asked him, and he expressed concern over whether he would be charged with robberies he had not committed. The detective assured him that would not happen.

Throughout the interview, the detective spoke in a casual, relaxed, and conversational tone, and he at no time raised his voice or became aggressive in any way. At one point, he told Ontiveros-Perez that he was starting to get a "pretty good picture of what kind of guy you are." He then told Ontiveros-Perez:

> Since you're being cooperative, I want you to – I appreciate that, and I'm not making you any promises. I can't promise you anything, okay. But what I'm going to do is – is – I'm going to put in my reports how cooperative you were, and those reports go to the district attorney's office. Again, it's up to them what they do, uh, and it doesn't mean anything really whether or not you're cooperative or not. I can't, I'm not promising you anything, okay? But here's the thing, Julio. Um, I'm a robbery detective, and I'm aware that there's been some other ones that you've done, okay? And I think what would be – what I'd like to see done here – is for you to just be 110% cooperative with me, okay, about the other robberies. I'm not, again, I'm not saying it's saving you anything. But I'm going to put in the reports that you were cooperative, and, uh, whether or not that does anything for you, I don't know. But, you know, the D.A.'s office will read those reports, is all I can tell you, okay?

Ontiveros-Perez continued to answer the detective's questions, and near the end of the interview, the detective asked him if he would be willing to drive around to the various robbery locations to confirm which of those businesses he had robbed. He agreed to do so.

Ontiveros-Perez then asked when he would be permitted to call his brother. He was concerned about making sure that his brother knew what was happening and that his brother would be able to retrieve certain tools from his truck. The detective responded that the drive-around would not take very long and that he could make as many calls as he wanted when they got back to the station. Ontiveros-Perez said, "Okay," and then went

with the detective and another officer to various robbery locations, confirming those that he had robbed.[13]

### 2.    State Trial Court Ruling

Before trial, Applicant filed a motion to suppress his statements to the police.[14] Following an evidentiary hearing,[15] the state trial court found that Applicant understood and could converse fluently in the English language, that Applicant received a proper *Miranda* advisement, and that he knowingly waived his *Miranda* rights and agreed to answer the police officers' questions.[16]   The trial court further determined that Applicant's statements to the police were voluntary and that the interviewing detective did not make any promises to Applicant "that would affect the defendant's cooperation or willingness to speak."[17]

---

[13]   Doc. # 11-1, at 2-7; Supplemental State Court R. (Doc. # 27), 2/16/06 videotaped police interview of Applicant ("People's Ex. 9"); State Court R., 10/27/06 Hr. Tr.

[14]   State Court R., Court File, at 62.

[15]   *Id.,*10/27/06 Hrg. Tr.

[16]   *Id.,* 11/6/06 Hrg. Tr. at 22-24.

[17]   *Id.* at 24-25.

### 3.   **Application of AEDPA Standard of Review**

      *a)*   *Applicant's ability to understand English*

Applicant claims that the waiver of his *Miranda* rights was not knowing or

voluntary because of his limited knowledge of the English language.  The Colorado

Court of Appeals initially determined that Applicant implicitly waived his *Miranda* rights

and voluntarily spoke with the arresting officer:

> Here, the arresting officer testified that after placing Ontiveros-Perez in
> custody, he read Ontiveros-Perez his *Miranda* rights from a standard card.
> After reading each right, the officer asked Ontiveros-Perez whether he
> understood, each time receiving an affirmative reply. After hearing and
> acknowledging his understanding of each of his rights, Ontiveros-Perez
> then agreed to speak with the officer. On these facts, and given that
> Ontiveros-Perez has not alleged that he was in any way coerced to speak
> upon his initial arrest, we conclude that he implicitly waived his rights and
> voluntarily spoke with the officer.[18]

The state appellate court then rejected Applicant's contention that he did not

knowingly and intelligently waive his rights because his English skills were insufficient

based on the following reasoning:

> . . . In this case, the trial court found, with ample record support,
> that Ontiveros-Perez's waiver was both knowing and voluntary.
>
>     Specifically, the record shows that Ontiveros-Perez had been in
> the United States approximately ten years and attended high school
> here for a few months. Moreover, the trial court found, and the video of the
> detective's interview of Ontiveros-Perez demonstrates, that
> Ontiveros-Perez ably conversed in and understood English. Indeed, he
> affirmed on the recording that he understood English; he informed the
> detective that if he had any trouble understanding, he would let the
> detective know; and he did so on two occasions. Finally, although
> Ontiveros-Perez spoke with an accent, the video of the interview shows
> that he was able to communicate with the detective without difficulty.

---

[18]   Doc. # 11-1 at 10.

For these reasons, we agree with the trial court that the alleged language barrier was insufficient to render Ontiveros-Perez's statements involuntary.[19]

The state courts' factual findings that Applicant was advised of his *Miranda* rights and that he understood and could converse in English, are presumed correct under 28 U.S.C. § 2254(e)(1) and are supported by the state court record.[20]  Applicant has not rebutted those findings with any clear and convincing evidence to the contrary. Furthermore, there is nothing in the record to indicate that Applicant was coerced into speaking with the arresting officer.  The Court thus finds that the Colorado Court of Appeals' decision that Applicant made a knowing and voluntary waiver of his *Miranda* rights was based on a reasonable determination of the facts in light of the evidence presented at the state court suppression hearing and comported with federal law. *See Moran*, 475 U.S. at 421.  *See also Valdez,* 219 F.3d 1222, 1231 (10th Cir. 2000) (factual record from state court proceeding showed that habeas petitioner understood English, which precluded his claim that his *Miranda* waiver was not knowing or intelligent); *see also United States v. Sanchez–Chaparro*, No. 09-8012, 392 F. App'x 639, 644-45 (10th Cir. Aug. 19, 2010) (concluding that the district court did not err in finding that the defendant knowingly and intelligently waived his *Miranda* rights when the defendant generally responded and conversed in English).

---

[19]   Doc. # 11-1 at 9-12.

[20]   *See* Supplemental State Court R., People's Ex. 9 (videotaped police interview of Applicant).

14

b)     *Promise of leniency*

Applicant also claims that his waiver was not voluntary because it was coerced

by police officer promises of leniency if he confessed.  The Colorado Court of Appeals

resolved this claim on the following grounds:

> Finally, Ontiveros-Perez contends that his statements were
> involuntary because they were the product of subtle psychological
> coercion, namely in the form of the detective's implied promises of
> leniency and conditioning of Ontiveros-Perez's phone call to his family
> on his cooperation during the drive-around. Although we agree with the
> trial court that it perhaps would have been better had the detective not
> discussed Ontiveros-Perez's cooperation and the detective's willingness to
> note that cooperation in his report, we are not persuaded that the
> detective's statements rendered Ontiveros-Perez's statements involuntary.
> . . .
>
> . . . [W]e agree with the trial court that Ontiveros-Perez's will was
> not overborne by the detective's statements that he would inform the
> district attorney's office of Ontiveros-Perez's cooperation. The detective's
> statements were repeatedly accompanied by statements such as those
> informing Ontiveros-Perez, "I'm not making you any promises. I can't
> promise you anything, okay," and "[I]t's up to [the D.A.'s office] what
> they do, uh, and it doesn't mean anything really whether or not you're
> cooperative or not." We conclude that the pervasiveness of the detective's
> qualifying statements clearly informed Ontiveros-Perez that he was not
> being promised any benefit.
>
> . . .
>
> For these reasons, we perceive no error in the trial court's refusal to
> suppress Ontiveros-Perez's statements to the police officers.[21]

The state appellate court's factual finding that the police detective did not make

any promises of leniency or other benefit to Applicant in exchange for his confession are

presumed correct and are supported by the DVD recording of the detective's interview

---

[21]   Doc. # 11-1 at 12-15.

of Applicant, following his arrest.[22]  Applicant has not rebutted the state court's factual

findings with any clear and convincing evidence to the contrary.  Because no promises

were made to Applicant, the Colorado Court of Appeals' determination that Applicant's

statements to the police were voluntary and not coerced was not contrary to or an

unreasonable application of Supreme Court law.  Applicant therefore cannot prevail on

his first claim for relief.

**B.**   **PROSECUTORIAL MISCONDUCT**

For his second claim, Applicant asserts that his rights under the Fourteenth

Amendment were violated by prosecutorial misconduct during closing argument.[23]

Habeas relief is appropriate when a prosecutor's comments "so infected the

trial with unfairness as to make the resulting conviction a denial of due process." *Darden*

*v. Wainwright*, 477 U.S. 168, 180 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S.

637, 643 (1974)); *see also United States v. Young*, 470 U.S. 1, 11 (1985)

("Inappropriate prosecutorial comments, standing alone, would not justify a reviewing

court to reverse a criminal conviction obtained in an otherwise fair proceeding.").

In applying this demanding standard, "it is not enough that the prosecutors' remarks

were undesirable or even universally condemned." *Darden*, 699 F.2d at 1036; *see also*

*Tillman v. Cook*, 215 F.3d 1116, 1129 (10th Cir. 2000) ("not every improper or unfair

remark made by a prosecutor will amount to a federal constitutional deprivation.").

Moreover, the federal habeas court does not consider a prosecutor's statement or

---

[22]   *See* Supplemental State Court R., People's Ex. 9 (videotaped police interview of
Applicant).

[23]   Doc. # 1 at 7.

argument "word by word in a vacuum," *Paxton v. Ward*, 199 F.3d 1197, 1217 (10th Cir.

1999).  Instead,

> [i]nquiry into fundamental fairness requires examination of the entire
> proceedings, including the strength of the evidence against the petitioner,
> both as to guilt at that stage of the trial and as to moral culpability at the
> sentencing phase. Any cautionary steps-such as instructions to the
> jury-offered by the court to counteract improper remarks may also be
> considered. Counsel's failure to object to the comments, while not
> dispositive, is also relevant to a fundamental fairness assessment.

*Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) (citations omitted & emphasis

added).  "The ultimate question is whether the jury was able to fairly judge the evidence

in light of the prosecutor's conduct."  *Bland v. Sirmons*, 459 F.3d 999, 1024 (10th Cir.

2006).

"The *Darden* standard is a very general one, leaving courts 'more leeway . . .

in reaching outcomes in case-by-case determinations.'" *Parker v. Mathews*, 132 S.Ct.

2148, 2155 (2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

### 1.   Comments on Witnesses' Demeanor

Applicant contends that the prosecutor's remarks concerning the demeanor of

the victims on the witness stand implied that Applicant was inflicting harm on the victims

in forcing them to testify by exercising his right to a jury trial.

During closing argument, the prosecutor commented:

> . . . and I can tell you most of these ID's in court were very difficult for
> these women, and I think you saw it in their demeanor when they testified.
>
>          * * *
> Wendy Manriquez . . . she also ID'ed him in court, although I think she
> didn't want to, as you saw her demeanor on the stand.
>
>          * * *

17

Deonna Burg . . . she had a difficult time testifying.  I think you all remember her.  She cried throughout a lot of it . . . . [S]he turned around and ID'ed him in court yesterday, that was difficult for her.  It's been almost a year, I think ten months, and she has to see the man who put the gun in her face.[24]

The Colorado Court of Appeals, reviewing for plain error, rejected Applicant's

claim, finding that the trial transcript, read in context, demonstrated otherwise:

. . . [The prosecutor] appears to have been responding to Ontiveros-Perez's assertions that the trauma that the victims experienced impacted the accuracy of their testimony and caused them to embellish their stories. The prosecutor's point appears to have been that the trauma that the victims experienced during the robberies remained with them and that the jurors could assess their credibility in light of that trauma.

To the extent that the prosecutor was so responding to Ontiveros-Perez's assertions, this argument was proper. *See Wallace*, 97 P.3d at 269 (in considering whether prosecutorial remarks are improper, reviewing court must take into account defense counsel's opening salvo). Likewise, to the extent that the prosecutor was merely intending to draw reasonable inferences as to the victims' demeanor and credibility, this argument, too, was proper. *See People v. Constant*, 645 P.2d 843, 846 (Colo. 1982).

Finally, to the extent that the prosecutor's argument might have been understood as an appeal to sympathy, notwithstanding the fact that it also was responsive to Ontiveros-Perez's challenge to the victims' credibility, we conclude that, in context, this argument was not flagrantly or glaringly or egregiously improper and did not so undermine the fundamental fairness of the trial as to cast serious doubt on the judgment of conviction. [State case law citations omitted].[25]

The state appellate court's determination that the prosecutor's comments about

witness demeanor were in response to defense counsel's opening statement is

---

[24]   State Court R., 12/5/065 Trial Tr., at 22-23, 32-33.

[25]   Doc. # 11-1 at 29-30.

18

presumed correct and is supported by the state court record.[26]  Applicant has failed

to point to any clear and convincing evidence to the contrary.   Furthermore, it was

reasonable for the Colorado Court of Appeals to conclude that the remarks were not

improper.  *See Young,* 470 U.S. at 13 ("if the prosecutor's remarks were 'invited,' and

did no more than respond substantially in order to 'right the scale,' such comments

would not warrant reversing a conviction.") (internal citation omitted); *see also Darden*,

477 U.S. at 182 (The "invited response [doctrine] is used not to excuse improper

comments, but to determine their effect on the trial as a whole.").

In addition, the state appellate court's determination that plain error did not occur

even assuming the prosecutor's comments "might have been understood as an appeal

to sympathy," was a reasonable application of Supreme Court law.  The prosecutor's

remarks challenged in *Darden*, which were held not to warrant habeas relief, were

considerably more inflammatory than the comments made by the prosecutor in this

case.  *Darden*, 477 U.S. at 180, n. 11 (prosecutor referred to the defendant as an

"'animal' "); *id.* at n. 12 ("'I wish I could see [the defendant] with no face, blown away by

a shotgun'").   As such, the Court cannot find that the state appellate court's resolution

of Applicant's claim was so lacking in justification that there was an error well

understood and comprehended in existing law beyond any possibility for fairminded

disagreement." *Richter*, 562 U.S., at ___, 131 S. Ct. at 786–787.  Accordingly, Applicant

is not entitled to federal habeas relief for his claim.

---

[26]  *See* State Court R., 11/28/06 Trial Tr., at 256-58.

### 2.   Statements Expressing Personal Opinion

Applicant asserts that the prosecutor engaged in unconstitutional misconduct when she expressed her personal opinion about the need to hold Applicant accountable for his crimes.

Reviewing for plain error, the state appellate court rejected this claim on the following grounds:

> With respect to the prosecutor's expression of personal opinion, the prosecutor argued, "He's kidnapping these women. I think it's time to hold Julio Ontiveros-Perez, the I'll-Be-Back Bandit, I think it's time to hold him responsible for what he's done." (Emphasis added.) We agree with Ontiveros-Perez that this argument was improper. . . .

> Nonetheless, in the context of this case, where Ontiveros-Perez conceded that he committed the robberies at issue, we cannot conclude that these isolated comments so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *See Lehnert*, 244 P.3d at 1185.[27]

A prosecutor may not "intentionally misstate the evidence or mislead the jury as to the inferences it may draw."  *Young*, 470 U.S. at 9 n.7.  In *Young*, the prosecutor made five comments to the jury in which he stated his personal opinion that the defendant committed fraud.  570 U.S. at 5-6.  The Supreme Court found no plain error because the comments were made largely in response to defense counsel's charge that not even the prosecutors believed the defendant was guilty; the comments did not suggest access to suppressed evidence; the comments were too brief and isolated to amount to plain error; and, the evidence against the defendant was overwhelming. *Id.* at 16.

---

[27]   Doc. # 11-1, at 30-31.

In this case, the prosecutor made an isolated remark expressing her opinion about the Applicant's guilt.[28]  The comment did not suggest that the prosecutor had access to information or evidence that had been concealed from the jury.  Further, defense counsel did not object to the remark as improper.  Moreover, the evidence against Applicant at trial was overwhelming, and included the following: his confession to the robberies; the testimony of eight victims that Applicant displayed a gun when he demanded money; and, the testimony of four victims that Applicant forced them at gunpoint to go to a back room or a bathroom during the robberies.[29]  In addition, four of the robberies were captured on security surveillance tapes.[30] Several items of clothing worn by the suspect in the videotapes were found in Applicant's possession and his fingerprints were found at three of the robbery locations.[31]  At trial, the defense admitted to the robberies and argued only that the B.B. gun Applicant used in commission of the robberies was not a deadly weapon.[32]  The Court finds that the state appellate court's determination that the prosecutor's comment did not "undermine[ ] the  fundamental fairness of the trial" was reasonable based on the totality of the trial proceeding and did not run afoul of Supreme Court law.   Applicant thus cannot prevail on his claim.

---

[28]   State Court R., 12/5/06 Trial Tr., at 39; 78-79.

[29]    State Court R., 11/30/06, 12/1/06, 12/4/06 Trial Trs; Supplemental State Court R., People's Ex. 9 (videotaped police interview of Applicant).

[30]   *Id.*, 12/4/06 Trial Tr., at 204-04.

[31]   *Id.* at 146, 150, 162, 204-06.

[32]   *Id.,* 12/5/06 Trial Tr., at 40-58.

3.     **Comment Concerning Community Safety**

Applicant next argues that the prosecutor engaged in misconduct in arguing:

"The defendant came into this community and he committed these offenses. He

committed these robberies, and he committed these kidnappings, and it's time he's

held accountable for what he did."[33]

The Colorado Court of Appeals determined that any prejudice resulting from the

comment was harmless:

> As Ontiveros-Perez notes, arguments that ask the jury to consider the wishes of the community or that inflame or appeal to the jurors' passions or prejudices are improper. [State case law citations omitted].

> Nonetheless, in the context of this case, in which Ontiveros-Perez conceded that he committed the robberies at issue, we cannot conclude that any error in allowing this argument requires reversal, because we perceive no reasonable probability that the argument contributed to the jury's verdict. [State case law citations omitted].[34]

"It is improper for a prosecutor to suggest that a jury has a civic duty to convict,"

*Thornburg v. Mullin*, 422 F.3d 1113, 1134 (10th Cir. 2005); *see also Viereck v. United*

*States*, 318 U.S. 236, 247-48, (1943), by "appeal[ing to] wholly irrelevant" issues,

*Viereck*, 318 U.S. at 247-48.  *See also  United States v. Rogers,* 556 F.3d 1130, 1143

(10th Cir. 2009) ("Prosecutors are not permitted to incite the passions of the jury by

suggesting they can act as the 'community conscience' to society's problems.").

Even if the prosecutor's remark was improper, the Court finds that the state

appellate court's determination that Applicant was not prejudiced by the prosecutor's

---

[33]  *Id.* at 78-79.

[34]  Doc. # 11-1 at 27.

appeal to the community's conscience was reasonable, in light of the evidence presented at trial.  As discussed previously, the government's case against Applicant was strong.  By far, the substantial majority of the prosecutor's closing argument was supported by the evidence presented at trial.  Furthermore, the state trial court instructed the jurors that their decision must be made based on the evidence presented at trial.[35]  Because Applicant confessed to committing the robberies, the evidence on the kidnapping charges was not contested, and the only issue at trial was whether the Applicant used a deadly weapon, the prosecutor's comment "was simply not egregious enough to influence the jury to convict on grounds other than the evidence presented." *Rogers*, 556 F.3d at 1143 (internal quotation marks and citation omitted); *see also Le*, 311 F.3d at 1022 (applying similar factors in holding that state court did not unreasonably apply federal law in ruling that the proceeding was not fundamentally unfair, notwithstanding an improper remark).  The Court thus finds that the state appellate court's decision was consistent with *Darden* because the remarks did not deprive Applicant of a fair trial.

### 4.    Comments to Which the Trial Court Sustained Objections

Finally, Applicant asserts that the following remarks made by the prosecutors deprived him of his constitutional right to a fair trial:

During closing argument, one of the prosecutors argued:

> [Ontiveros-Perez was] trying to buy more than what he was able to provide for his family, a nice truck, a nice house, and he did it by sticking guns in women's faces. That's how they got the extra money.

---

[35]   State Court R., Court File, at 369.

23

> You may have done something different. You may have
> decided that you'd get a second job. You may have asked
> your family for more money. You may have taken on a better
> job.[36]

The trial court sustained defense counsel's objection to this argument as

improper.[37]  The other prosecutor later argued, "Ask these women [i.e., the victims] if it's

a deadly weapon."[38]  The trial court again sustained defense counsel's objection.[39]

Notwithstanding the court's ruling, a short time later, the prosecutor stated, "Let's ask

the victims of those cases. Let's ask [the victim] at Loan Mart whether it's a deadly

weapon."[40]  The trial court sustained defense counsel's repeated objection.[41]

The Colorado Court of Appeals found that the prosecutor's arguments were

improper,[42] but that the arguments, when viewed individually or cumulatively, did not

deprive Applicant of a fair trial:

> As previously stated, we do not condone the prosecutors' repeated
> transgressions . . . . Nonetheless, in the unique circumstances of this
> case, we cannot conclude that the cumulative effect of the prosecutors'
> improper arguments prejudiced the jury to such an extent as to affect the
> fundamental fairness of Ontiveros-Perez's trial.
>
> As noted above, the evidence that Ontiveros-Perez had robbed
> each of the institutions was overwhelming. Indeed, he conceded

---

[36]  *Id.*, 12/5/06 Trial Tr., at 15.

[37]  *Id.*

[38]  *Id.* at 63.

[39]  *Id.*

[40]  *Id.* at 69.

[41]  *Id.*

[42]  Doc. # 11-1 at 26.

committing the robberies and challenged only whether he had used a deadly weapon. Moreover, the prosecutors' comments came at the conclusion of a lengthy trial and, in general, were fleeting in nature. [State case law citation omitted].

Accordingly, we conclude that the prosecutors' improper arguments, viewed either individually or cumulatively, did not deny Ontiveros-Perez a fair trial in this case.[43]

To demonstrate a due process violation, Applicant must show that improper argument by the prosecutor deprived him of a fair trial. *See Darden*, 477 U.S. at 180; *see also Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (habeas petitioner must establish that any constitutional error at his trial had a "substantial and injurious effect or influence in determining the jury's verdict.") (internal quotation marks omitted).

Cumulative error is present when the "cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002) (quoting *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir.1990) (en banc)). "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of trial is such that collectively they can no longer be determined to be harmless." *Id.* (quoting *Rivera*, 900 F.2d at 1470). On federal habeas review, a cumulative error analysis applies only to cumulative constitutional errors. *Young v. Sirmons*, 551 F.3d 942, 972 (10th Cir. 2008).

There is a split in the Circuit Courts of Appeal as to whether the need to conduct a cumulative-error analysis is clearly established federal law under § 2254(d)(1). *Hooks*

---

[43] *Id.* at 32-33.

*v. Workman*, 689 F.3d 1148, 1194 n.24 (10th Cir. 2012).  The Tenth Circuit has indicated that its "body of precedent may very well signal where our court has come down on this issue–viz., that cumulative-error analysis is clearly established law." *Id.*; *see also Littlejohn v. Trammell*, 704 F.3d 817, 869 (10th Cir. 2013) (recognizing that "[a]though we have never expressly held . . . that cumulative-error analysis is clearly established federal law, we have long conducted cumulative-error analyses in our review of federal habeas claims.") (collecting cases).  However, this Court need not resolve the issue because under the deferential AEDPA standard of review, Applicant is not entitled to relief.

As discussed previously, the prosecution's evidence of guilt was quite strong, consisting of Applicant's taped confessions to the robberies, corroborating physical evidence, and the victims' uncontested testimony that Applicant displayed a gun when he demanded money and forced some of them at gunpoint to move to a back room or bathroom during the robberies.  In addition, the trial court instructed the jurors that they may only consider the evidence admitted at trial in reaching a verdict and that neither sympathy or prejudice should influence their decision.[44]  Despite the impermissible prosecutorial comments, it was not unreasonable for the Colorado Court of Appeals to conclude that the improper arguments, viewed individually or cumulatively, "did not deny Applicant a fair trial in this case."  The Court finds that the state appellate court's determination was not contrary to, or an unreasonable application of, federal law.

---

[44]   State Court R., Court File, at 269.

In short, Applicant cannot prevail on his second claim for relief, asserting prosecutorial misconduct.

## C.   <u>DOUBLE JEOPARDY</u>

For his third claim, Applicant asserts that his right not to be twice put in jeopardy for the same offense was violated because he was convicted of robbery, and his kidnapping convictions were enhanced based on the fact that the victims were robbed. *See* COLO. REV. STAT. (C.R.S.) § 18-3-302(3)(b) (2012) (elevating second degree kidnapping to a class two felony where the person kidnapped "is the victim of a robbery").[45]

On direct appeal to the Colorado Court of Appeals, Applicant argued that prior Colorado case law allowing the enhancement was undermined by the holdings in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny.[46]  He asserted that "sentence enhancers are elements for purposes of double jeopardy, and since the aggravated robbery convictions here were predicate offenses for the class 2 felony kidnapping, they should be vacated."[47]

The Double Jeopardy Clause of the Fifth Amendment protects a defendant against "cumulative punishments for convictions on the same offense." *Ohio v. Johnson*, 467 U.S. 493, 500 (1984).  In *North Carolina v. Pearce*, 395 U.S. 711 (1969), the United States Supreme Court characterized the Double Jeopardy Clause as protecting

---

[45]  Doc. # 1 at 7.

[46]  Doc. # 11-5 at 49.

[47]  *Id.* at 50.

individuals from prosecution after either an acquittal or conviction of the same offense, and in addition, from being subjected to multiple punishments for the same offense. *Id.* at 717.   In *Missouri v. Hunter*, 459 U.S. 359 (1983), the Court clarified that with respect to cumulative sentences imposed at a single proceeding the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.   *Id.* at 366–69 ("Where, as here, a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under *Blockburger*,[48] a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial," *id.* at 369).

Under Colorado law, robbery is not a lesser included offense of second-degree kidnapping because the elements of the crimes are not identical.  *See* §§ 18-3-302(1); 18-4-301(1), C.R.S.  Instead, robbery is a penalty enhancement factor in second-degree kidnapping.  *See People v. Henderson*, 810 P.2d 1058, 1062 (Colo. 1991) (citing *People v. Powell*, 716 P.2d 1096, 1104-05 (Colo. 1986)).  The Colorado General Assembly intended to enhance a defendant's sentence "not on the basis of an element of the same offense but rather by virtue of conviction for a separate offense." *Henderson*, 801 P.2d at 1062 (quoting *Powell*, 716 P.2d at 1014).  Accordingly, because Applicant's sentences for the kidnapping convictions involving robbery are authorized by the state

---

[48]   *Blockburger v. United States*, 284 U.S. 299, 304 (1932) (holding that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.")

legislature, the sentences comport with *Missouri*.  The Court must decide only whether the enhanced sentence violates the rule of *Apprendi*.

Relying on *Apprendi* and its progeny, Applicant argues that there is no rational basis for treating a sentence enhancer as the functional equivalent of an element of an offense for purposes of the jury-trial guarantee, but not for purposes of the Double Jeopardy Clause.  In *Apprendi*, the Supreme Court held that any fact, other than a prior conviction, that is used to enhance a defendant's sentence beyond the prescribed statutory maximum, must be submitted to the jury and proven beyond a reasonable doubt.  530 U.S. at 490.  The *Apprendi* Court noted that for purposes of the Sixth Amendment guarantee of jury determinations, it is inconsequential whether a required fact is organized in a particular statutory proscription as a sentencing factor or as an element because in this context any factor that increases the defendant's sentence beyond the statutory maximum for his offense operates as the "functional equivalent" of an element of a greater offense. 530 U.S. at 494 n. 19.

In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court considered an Arizona statute which, following a jury determination of guilt of first-degree murder, authorized the trial judge alone to determine the existence or absence of aggravating circumstances.  The Supreme Court overruled a previous case upholding the state statute, and held that: "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' *Apprendi*, 530 U.S., at 494, n. 19, the Sixth Amendment requires that they be found by a jury." *Ring*, 536 U.S. at 609.

The following year, the Supreme Court decided *Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003).  The petitioner in *Sattazahn* was convicted in a Pennsylvania state court of various crimes, including first degree murder. At the penalty phase of the trial, the prosecution "presented evidence of one statutory aggravating circumstance: commission of the murder while in the perpetration of a felony," and the petitioner presented evidence of two mitigating circumstances. *Id.* at 104.  At the close of the evidence, the jury deliberated and was deadlocked. *Id.*  The trial judge discharged the jury as hung and later entered a life sentence. *Id.* at 104–05.  On direct appeal, the Pennsylvania Superior Court concluded that the jury instructions were erroneous and "reversed petitioner's first-degree murder conviction and remanded for a new trial." *Id.* at 105.  On remand, the prosecution filed a notice of intent to seek the death penalty, alleging the same aggravating circumstance it had attempted to prove at the first trial, but also "a second aggravating circumstance, petitioner's significant history of felony convictions involving the use or threat of violence to the person." *Id.* "At the second trial, the jury again convicted petitioner of first-degree murder, but this time imposed a sentence of death." *Id.* On direct appeal, the Pennsylvania Supreme Court "concluded that neither the Double Jeopardy Clause nor the Due Process Clause barred Pennsylvania from seeking the death penalty at petitioner's retrial." *Id.*

In *Sattazahan*, the Supreme Court addressed the issue of whether the jury's inability to agree on whether an aggravating factor had been proven was the equivalent of an "acquittal" on the state's "charge" that an aggravating factor was present.  Just as a hung jury on a substantive charge is not the equivalent of an acquittal on that charge,

the Court concluded that the penalty phase jury's "result – or more appropriately, that non-result – cannot fairly be called an acquittal." *Id.* at 109.  Three justices then went on to opine, in Part III of the opinion, that there would be "no principled reason to distinguish, in this context, between what constitutes an offense for purposes of the Sixth Amendment's jury-trial guarantee and what constitutes an 'offense' for purpose of the Fifth Amendment's Double Jeopardy Clause." *Id.* at 111.

The Colorado Court of Appeals considered *Apprendi*, *Ring* and *Sattazahan* in rejecting Applicant's claim on the following grounds:

### V.  Merger of Convictions

Finally, Ontiveros-Perez argues that even if his convictions should not be reversed, his convictions for aggravated robbery must merge into his convictions for second degree kidnapping. We are not persuaded.

Ontiveros-Perez's argument is premised on his view that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, including *Ring v. Arizona*, 536 U.S. 584 (2002), rendered invalid the holding in *People v. Henderson*, 810 P.2d 1058, 1062-64 (Colo. 1991), that the crime of sexual assault did not merge into the crime of second degree kidnapping involving sexual assault, because sexual assault was not an "element" of kidnapping, but rather was a sentence enhancer.

As Ontiveros-Perez observes, the Colorado Supreme Court has granted certiorari to decide the question that he now presents. See *People v. Lewis*, (Colo. App. No. 04CA2072, Feb. 12, 2009) (not published pursuant to C.A.R. 35(f)) (cert. granted Jan. 11, 2010). We also note that the United States Supreme Court took up this question in *Sattazahn v. Pennsylvania*, 537 U.S. 101, 110-13 (2003), and the opinion authored by Justice Scalia in fact supports Ontiveros-Perez's position. The relevant portion of Justice Scalia's opinion, however, was joined by only two other justices and, to date, has not garnered the votes of a majority of the Supreme Court.

Under these circumstances, although there is some force to Ontiveros-Perez's argument, until the Colorado Supreme Court tells us otherwise, we, like other divisions of this court, cannot conclude that

*Apprendi* and its progeny invalidated *Henderson.* [State case law citations omitted].

Accordingly, we conclude that Ontiveros-Perez's aggravated robbery convictions do not merge into his second degree kidnapping convictions.[49]

Applicant's argument that *Sattazahan* effectively over-ruled the Colorado Supreme Court's decisions in *Henderson* and *Powell* is not well taken. *Sattazan* did not hold that a sentence enhancing crime is a lesser included offense of the crime it enhances. The language that Applicant relies on in Part III of *Sattazahan* is the opinion of a three-member plurality of the Supreme Court.[50] And, as the Colorado Supreme Court observed in *Lewis v. People*, 261 P.3d 480 (Colo. 2011):

[T]he context as to which the three Justices opined was that of a second trial-like capital sentencing proceeding, following an earlier jury finding that the prosecution had failed to prove any capital aggravating factor. In suggesting the equal applicability of *Apprendi* to the Double Jeopardy Clause, this comment can therefore be reasonably understood to refer at most to the sequential prosecutions properly the subject of the Double Jeopardy Clause. The three opining Justices neither suggested a modification of, nor even addressed, the Court's separate treatment of multiple punishments imposed in a single proceeding.

---

[49]   Doc. # 11-1 at 33-35.

[50]   In *Marks v. United States,* 430 U.S. 188 (1977), the Supreme Court held that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Id.* at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15 (1976)). In *Sattazahan*, Justice Scalia announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, I, IV and V. Justice Scalia also filed an opinion with respect to Part III, in which two other Justices joined. Justice O'Connor filed an opinion concurring in part, and concurring the judgment. Justice Ginsburg, joined by four other justices, filed a dissenting opinion. The language relied on by Applicant for his double jeopardy argument is contained in Part III of the *Sattazahan* Opinion. The Court does "not apply *Marks* when the various opinions supporting the Court's decision are mutually exclusive." *United States v. Carrizales–Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006); *see also Large v. Fremont Cnty., Wyo.*, 670 F.3d 1133, 1141 (10th Cir.2012).

*Id.* at 484.[51]

Furthermore, the language in Part III of the *Sattazahan* opinion is *dicta* because once the Court determined that the jury's deadlock was not the equivalent of an "acquittal" on an aggravating factor, the outcome of the case was decided.  For all these reasons, the "greater offense" doctrine set forth in Part III of the *Sattazahan* opinion does not constitute controlling law.  *See House*, 527 F.3d at 101 ("[W]ithout clearly established federal law, a federal habeas court need not assess whether a state court's decision was 'contrary to' or involved an 'unreasonable application' of such law."); *see also Montour v. Clements*, No 11-cv-02404-MSK, 2011 WL 5176160 at *6 (D. Colo. Oct. 31, 2011) (recognizing that Part III of the *Sattazahan* opinion does not reflect binding law), *aff'd Montour v. Clements*, No. 11-1526, 463 F. App'x 808 (10th Cir. May 9, 2012).  The state appellate court's determination that Applicant's sentence did not run afoul of *Apprendi* does not conflict with any clearly established Supreme Court law.  Accordingly, Applicant cannot prevail on his third claim for relief.

Finally, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status will be denied for the purpose of appeal.  *See Coppedge v. United States*, 369 U.S. 438 (1962).  If Applicant files a notice of appeal he must also pay the full $455 appellate

---

[51]   In *Lewis v. People*, 261 P.3d 480 (Colo. 2011), the Colorado Supreme Court declined to over-rule *Henderson*.  The Court held that the elevation of the defendant's second degree kidnapping convictions to level of class two felony because of same sexual assault for which defendant was separately sentenced did not violate his Sixth Amendment right to have any fact increasing his penalty beyond statutory maximum submitted to jury and proved beyond reasonable doubt.

filing fee or file a motion to proceed *in forma pauperis* in the United States Court of Appeals for the Tenth Circuit within thirty days in accordance with Fed. R. App. P. 24.

## IV.  <u>ORDER</u>

Accordingly, it is

ORDERED that the Application For A Writ Of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (Doc. # 1) is DISMISSED WITH PREJUDICE. It is

FURTHER ORDERED that a certificate of appealability <u>shall not issue</u> because Applicant has not made a substantial showing of the denial of a constitutional right. *See 2*8 U.S.C. § 2253(c)(2); Fed. R. Governing Section 2254 Cases 11(a); *Slack v. McDaniel*, 529 U.S. 473, 483–85 (2000). It is

FURTHER ORDERED that leave to proceed *in forma pauperis* on appeal is DENIED.  Applicant may file a motion in the Tenth Circuit.

DATED this   7th   day of May, 2013, at Denver, Colorado.

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge